AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

Southern District of West Virginia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No. 5:19-mj-00047 |
| Residence of John Zakresky, with an address of 173 Lori Street, Beckley, Raleigh County, West Virginia | ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the _____Southern_____ District of _____West Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841 and 846 | Distribution of controlled substances and conspiracy to distribute or possess with intent to distribute Controlled Substances |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *) is requested under* 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

John Hubbard, Special Agent FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date:   09/10/2019        _____
*Judge's signature*

City and state:  Beckley, West Virginia        Omar J. Aboulhosn, United States Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

The residence, all structures, vehicles, and curtilage located at 173 Lori Street, Beckley, Raleigh County, West Virginia and within the Southern District of West Virginia.  The residence is a two-story residence with white siding, black roof, and a front covered porch.  The number 173 is marked on the mailbox located at the front of the property.  There is a large covered structure and garage like structure in front of property and a shed and pool located towards the back of the property.







**ATTACHMENT B**

1.    Evidence  of  Drug  Trafficking:  Controlled  substances,
packaging  materials,  scales,  cutting  agents,  presses,  rubber
bands,  plastic  bags,  discarded  wrappers,  ledgers,  bills  of  sale,
owe   sheets,   lists   of   telephone   numbers   or   other   contact
information,   identifying   information   of   customers   and/or
suppliers,  documents  related  to  the  electronic  transfer  of  money
to  include  receipts  for  Western  Union,  MoneyGram  and  the  like,
prepaid  debit  cards,  items  associated  with  the  use  of  controlled
substances  such  as  smoking  devices,  needles,  items  with  suspected
drug  residue,  cellular  telephones,  and  digital  media  storage;

2.    Evidence  of  Occupancy:  Utility  bills,  deeds,  mortgage
records,  identification  documents,  and  mail;

3.    Evidence  of  Firearms  Possession  and  Use:  Firearms,
ammunition,  bills  of  sale,  firearm  boxes  and  packaging,  receipts
relative  to  the  purchase  firearms  and  ammunition,  photographs  of
firearms,  holsters,  slings,  ammunition  belts,  body  armor;

4.    Fruits  of  Criminal  Activity:  United  States  currency,  all
documents  showing  the  purchase,  ownership,  lease  (as  lessor  or
lessee),  or  sale  of  any  asset,  personal  or  real  to  include
automobiles,  boats,  motorcycles  or  similar  motorized  conveyances
to  include  deeds,  titles,  and  bills  of  sale.

# A F F I D A V I T

STATE OF WEST VIRGINIA

COUNTY OF RALEIGH, to-wit:

I, John Hubbard, being duly sworn, hereby depose and state as follows:

## INTRODUCTION

1.  This affidavit is made in support of an application for a search warrant to search the premises as more particularly described in Attachment A located at 173 Lori Street, Beckley, Raleigh County, West Virginia.  Based on the facts set forth herein, probable cause exists that evidence of violations of 21 U.S.C. §§ 841 - distribution of controlled substances and possession with intent to distribute controlled substances, 21 U.S.C. § 846 - conspiracy to distribute controlled substances, and 21 U.S.C. § 856 - maintaining a drug-involved premises, fruits of that criminal activity, and property designed for use, intended for use, or used to commit those offenses are currently located at that location.

2.  I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since July of 2017.  I am a graduate of the FBI Training Academy in Quantico, Virginia, where I received training in controlled substance investigations, white-collar crime, cyber-crime, interviewing, interrogation, evidence collection, intelligence analysis, and legal matters, among other

topics.  I am currently assigned to the Charleston, West Virginia Resident Agency of the Pittsburgh Division.  As part of my duties with the FBI, I investigate violations of federal law, including drug trafficking offenses enumerated in Title 21 U.S.C 841 and 846.  I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3.    There is probable cause to believe that the individuals identified below and others yet unknown, are members of an extensive drug trafficking network and have committed, are committing and will continue to commit the following offenses: (i) the distribution and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); (ii) conspiracy to commit and attempts to commit these offenses, in violation of Title 21, United States Code, Section 846; (iii) use of a communications facility in facilitating the commission of the foregoing offenses, in violation of Title 21, United States Code, Section 843(b); and (iv) illegal possession of firearms in violation of Title 18 United States Code, Sections 922(g) and 924(c).

4.    The individuals identified as members or participants in the drug trafficking organization include OYONTI

2

JONES, also known as "Oyontikeyta Jones", "DC" and "Nasty"; STEPHANIE MCCLUNG, also known as "Stephanie Tucker" and "New York"; JOHN ZAKRESKY, also known as "Jonathan" and "Johnny"; JASON JOHNSON, also known as "H" or "H.O."; MAURELL KURTZ, also known as "Sin"; WILLIAM GENE SMITH JR, also known as "Billy"; NICKY ATTILLI, also known as "Nick"; TIMOTHY LAWSON, also known as "Timmy"; JASON PAFFORD; COREY AMON MOORE; TERRION STEVE BORJA, also known as "Tido"[1]; KANIUS CHRISTOPHER HILL, also known as "Christopher Hill"; CLIFFORD DWAYNE HOWELL JR, also known as "T"; SHANEKA BLACK; MARIKA HICKMAN DAVIS; CAITLIN ASBURY; and others.

5.     The information contained herein is based on my knowledge, training, and experience, my direct involvement in this investigation, and upon information relayed to me by other law enforcement agents, and other witnesses. Because this Affidavit is being submitted for the limited purpose of seeking a search warrant for the above-named property, I have not set forth each and every fact learned during the course of this investigation, but simply those facts which I believe are necessary to establish probable cause.

<u>BACKGROUND</u>

6.     From May to September 2019, law enforcement monitored multiple SUBJECT TELEPHONES used by members of the JONES

---

[1] In previous affidavits, BORJA's nickname was listed at "Tito". After executing a search warrant on JONES' cellular telephone, agents discovered his nickname is "Tido".

3

organization pursuant to wiretap orders authorized by United States District Judge Irene C. Berger.  Based upon the monitored calls, investigators confirmed that JONES received drugs from California through the mail.  Through the interceptions, agents were able to determine JONES' source of drug supply, and the time and dates of when packages of controlled substances would arrive in West Virginia.  Interceptions of SUBJECT TELEPHONES provided information on how JONES distributes controlled substances. It was discovered that ZAKRESKY works directly for JONES and assists JONES with collection of money and distribution of drugs.  PAFFORD worked for JONES by distributing drugs.  MCCLUNG did work for JONES but stopped working for JONES.  MCCLUNG continued to distribute drugs by receiving drugs from other suppliers.  PAFFORD also receives heroin from ZAKRESKY and ZAKRESKY's other supplier, HOWELL.  Since the arrest of JONES, BLACK has been collecting JONES' drug money from ZAKRESKY.

BACKGROUND: IDENTIFICATION OF LOCATIONS CONTAINING EVIDENCE

7. Investigators have also conducted extensive surveillance of targets of this investigation both through physical "on-the-street" surveillance and by using pole cameras. The surveillance coupled with the monitored telephone calls have identified the following locations as being used to store or distribute controlled substances and/or hold drug proceeds at

4

various times between May 2019 and the date of this application
and affidavit:

> A. 173 Lori Street, Beckley, West Virginia- residence of
>    JOHN ZAKRESKY;
>
> B. 127 Rhodes Street, Beckley, West Virginia- residence of
>    JASON PAFFORD;
>
> C. 316 Old Grove Road, Crab Orchard, West Virginia-
>    residence of STEPHANIE MCCLUNG; and
>
> D. 313 Rolling Hill Drive, #1, Princeton, West Virginia –
>    residence of SHANEKA BLACK.

<u>BACKGROUND: DRUG SEIZURES AND PURCHASES</u>

8.    Based on wire intercepts, KURTZ supplied MCCLUNG
with methamphetamine.  KURTZ was arrested on June 30, 2019 for an
outstanding warrant out of Detroit, Michigan.  A search warrant
was executed at the hotel room that he was occupying.  During the
search two plastic sandwich bags of Crystal Methamphetamine
totaling approximately 9 grams, a plastic bag containing
approximately 2 grams of Marijuana, three cell phones, US Currency,
a semi-automatic pistol, and a black thumb drive were among the
things recovered. The suspected methamphetamine was tested at the
DEA Laboratory.  One bag contained approximately 5.4 grams of
99%±4% methamphetamine and the other bag contained that contained
approximately 3.4 grams of 98%±4% methamphetamine.

9.    On July 16, 2019 at 5:32 PM (Session 2513), JONES, on SUBJECT TELEPHONE #6, received an incoming call from BORJA on phone number 619-522-4104. During the call, JONES said he would give BORJA $3,000 dollars, but owe BORJA $1,000 dollars, and then asked BORJA to send JONES a quantity of 3 of a controlled substance ("I'm a give your ass uh half your shit, uh half your bread. Let me see. No I'm gonna send uh just I'm I'm gonna give you 3 and I owe you a rack, and you grab me 3."). BORJA asked JONES "Oh you want 3 of em?" JONES replied "Yeah? Yeah." BORJA responded "Alright." On July 17, 2019 at 2:57 PM (Session 2581), JONES, on SUBJECT TELEPHONE #6, received an incoming call from BORJA on phone number 619-522-4104. BORJA asked JONES to send BORJA "that address." On July 17, 2019 at 3:04 PM (Session 2585), JONES, on SUBJECT TELEPHONE #6, sent a text message to BORJA on phone number 619-522-4104 with the following text: "203 peck st. Bluefield wv. 24701". On July 17 and July 18, 2019, JONES, on SUBJECT TELEPHONE #6, exchanged text messages with BORJA on phone number 619-522-4104. The following was discussed:

BORJA (Session 2587 at July 17 at 3:06 PM):  👆

BORJA (Session 2599 at July 17 at 3:09 PM):  ⬆💯

JONES (Session 2693 at July 18 at 8:17 AM):  What's the tracc

6

BORJA (Session 2698 at July 18 at 11:51 AM):

1Z86652V0223118996

I believe BORJA told JONES that the package was sent ("👍" and "♠100"). JONES then asked what the tracking number was for the package("What's the tracc"). On July 19, 2019, CPL Williams, responded to UPS located at 3100 McCorkle Avenue, SW, South Charleston, West Virginia, 25303. Williams found the SUBJECT PARCEL at the UPS location. Williams provided a trained narcotic detection dog named "FEERA." CPL Williams informed me that FEERA positively alerted on the SUBJECT PARCEL indicating the presence of the odor of a controlled substance. After FEERA indicated on the SUBJECT PARCEL, Williams took custody of the SUBJECT PARCEL. On July 19, 2019, a search warrant was obtained for the SUBJECT PARCEL and four individually wrapped packages weighing approximately one pound each was seized. One of the four packages was field tested and subsequently tested positive for methamphetamine. The packages were sent to the DEA Laboratory pending results.

    10.  On July 25, 2019, Raleigh County Drug Task Force met with a Confidential Informant (CI) #205128, for the purpose of arranging a drug purchase from PAFFORD. The CI was provided audio/video equipment and $125.00 in U.S. Currency in order to purchase an amount of Crystal Methamphetamine "ICE" from PAFFORD.

7

The CI was transported to PAFFORD's residence by law enforcement. Upon completion of the drug transaction the CI got back into the vehicle with law enforcement and provided law enforcement with a clear bag containing a crystal-like substance represented as being Crystal Methamphetamine "ICE." During the debrief the CI told law enforcement that the suspected methamphetamine was purchased from PAFFORD using the $125. CI stated they went into PAFFORD's residence and entered the second door on the left. The CI stated PAFFORD weighed an amount of methamphetamine, which was purchased by the CI. The CI stated they saw a brown triangle container with a brown powder substance inside. A review of the video showed the CI arriving at PAFFORD's residence. The CI knocked on PAFFORD's door and was allowed to enter. The CI was asked by PAFFORD what he/she wanted and the CI responded with "a ball." PAFFORD weighed out the suspected methamphetamine. PAFFORD asked the CI how much cash he/she had and the CI responded with "$125." PAFFORD handed the CI the suspected methamphetamine and the CI gave PAFFORD the US Currency.

     11.  JONES and DAVIS were arrested on August 9, 2019 in Beckley, West Virginia after a traffic stop. Law enforcement searched the vehicle that they were traveling in and located an opened brown cardboard box. Inside the box contained packaging and a plastic container with two wrapped packages that weighed approximately 1.2235 kilograms. Both packages were field tested

and tested positive for methamphetamine.  The packages were sent
to the DEA Laboratory pending results.

12.   On August 21, 2019, law enforcement met with CI
#204907 to arrange a controlled buy from PAFFORD and an unknown
white male known to the CI as "Peanut."  The CI contacted "Peanut"
via cell phone at 304-207-2192 for the purpose of arranging the
drug transaction.  The CI was instructed by "Peanut" to come to
127 Rhodes Street, Beckley, WV.  Law enforcement provided the CI
with audio/video equipment and $165.00 in US currency, in order to
make a purchase of an amount of methamphetamine and heroin from
"Peanut" and PAFFORD at 127 Rhodes Street, Beckley, WV. The CI
arrived at 127 Rhodes Street and entered through the back door to
the residence where he/she was then met by "Peanut." CI gave the
US currency to "Peanut" who then entered a room off of the kitchen
and gave the currency to PAFFORD.   Shortly later, "Peanut" then
provided to the CI a clear bag with a superman symbol containing
a brown chunky substance represented as being heroin and a clear
bag with a superman symbol containing a crystal-like substance
represented as being methamphetamine.  The two bags were provided
to "Peanut" by PAFFORD. The CI then exited the residence, returned
to law enforcement, and provided law enforcement a clear bag with
a superman symbol containing a brown chunky substance represented
as being heroin and a clear bag with superman symbol containing a

crystal-like    substance    represented    as    being    crystal
methamphetamine.

13.   On September 3, 2019, law enforcement met with CI
#204907 to arrange a controlled buy from PAFFORD and an unknown
white male known to the CI as "Peanut." CI contacted Peanut via
cell phone at 304-207-2192 for the purpose of arranging the drug
transaction.   The CI was then instructed by "Peanut" to come to
127 Rhodes Street, Beckley, WV.   The CI was provided audio/video
equipment and $220.00 in U.S. Currency, in order to purchase an
amount of methamphetamine and heroin from "Peanut." CI arrived at
127 Rhodes Street and entered through the back door of the
residence where he was then met by "Peanut."   The CI provided
$220.00 to "Peanut."    "Peanut" provided a piece of folded foil
containing a brown chunky substance represented to be heroin and
clear bag imprinted with a superman symbol containing a clear like
substance represented to be crystal methamphetamine. The CI then
exited the residence, returned to law enforcement, and provided to
law enforcement a piece of folded foil containing a brown chunky
substance represented to be heroin and clear bag imprinted with a
superman symbol containing a clear like substance represented to
be crystal methamphetamine.

<u>BACKGROUND: ITEMS TO BE SEIZED</u>

14.   Based upon my experience and training, consultation
with other law enforcement officers experienced in drug and

financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a.    Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting, testing, distributing and manufacturing controlled substances.

b.    Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time.  It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts.  Such records are often maintained for a substantial period of time even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded.  Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

c.    Individuals involved in narcotics trafficking must often rely on other to obtain their drugs and to help them market the narcotics.  Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence.

11

d.   Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in the names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace. Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

e.   Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for every day expenditures and to maintain and finance their ongoing narcotics business. Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

f.   Individuals involved in narcotics trafficking often maintain weapons, firearms and ammunition on their person or in their residence and /or vehicles.  Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms.  Furthermore,

12

I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

g.   Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owing, frequenting or controlling the residence and premises.

h.   Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i.   Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and usually maintain these items on their person and/or in their residences and vehicles.

j.   Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics

trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

15. It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs and chemicals at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the target location despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

16. The investigation into the criminal activities of the above individuals reveals that their drug distribution activities are ongoing. Due to the quantities of narcotics being distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long period of time. Based on my training and experience, I believe that the criminal activity described above is, by nature, self-

14

perpetuating.  Several of the participants involved in the drug distribution have been targets of law enforcement for several years.  They have been arrested on drug distribution investigations in the past but this has not deterred them from continuing in the business of drug trafficking and distribution.  As a consequence, I believe that the items described in Attachment B will provide evidence of the events set forth in this affidavit and that such articles can be found at 173 Lori Street, Beckley, Raleigh County, West Virginia despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

<u>SEARCH PROTOCOL FOR CELLULAR TELEHONES AND PDAS</u>

17.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  Cellular service providers allow for their subscribers to access their device over the internet and remotely destroy all of that data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to

15

the network.   Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.   Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired.   Conversations can be hidden in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

<u>PROBABLE CAUSE TO SEARCH RESIDENCE OF JOHN ZAKRESKY</u>

18.   As set forth above, this investigation has involved the interception of telephonic communications from several members of or participants in the JONES drug trafficking organization. Agents have intercepted communications on the telephone lines of JONES and ZAKRESKY.   Intercepted calls reveal that PAFFORD worked for JONES and distributes drugs. ZAKRESKY bases his drug trafficking activities at his residence located at 173 Lori Street, Beckley, West Virginia.

19.  On August 7, 2019, ZAKRESKY, on SUBJECT TELEPHONE #5, received an incoming call from Unknown Male, on telephone (681) 422-3301.  Based on my training, experience, and the investigation thus far, UM asked if ZAKRESKY wanted four ounces of drugs ("I said, you wanted four, correct?") and ZAKRESKY replied "Yes."  UM stated that he would be at ZARKESKY's residence within the hour ("Okay, well, we will be there within the hour.").  At approximately 7:24 PM, UM arrived in a red Ford F-150 West Virginia license plate 63Y 485.  UM exited the passenger side of the truck, carried an item in his hand, and went into a garage/shed structure. Both ZARKESKY and UM exited the structure at approximately 7:27 PM.  UM departed in the truck at approximately 7:37 PM.  I believe the drug transaction occurred in the garage/shed structure.

20.  On August 25, 2019, ZAKRESKY, on SUBJECT TELEPHONE #7, exchanged text messages with SHANEKA BLACK, on (304) 809-8796 (SUBJECT TELEPHONE #9).  The following text messages were exchanged:

ZAKRESKY (Session 111 at 6:59 PM):   Still no answer on smoke but I am checking and I'll have a total of what's at the house for u this evening when everyone drops

BLACK (Session 112 at 7:00 PM):   Okay

Based on my training, experience, and the investigation thus far, I believe ZAKRESKY told BLACK that he did not make contact with

17

his marijuana supplier for BLACK and that he will know the total amount of money from drug proceeds for BLACK as soon as his drug customers drop off the money at ZAKRESKY's residence, 173 Lori Street, Beckley, West Virginia, that they owe ZAKRESKY.    BLACK responded "Okay".

21.    On August 25, 2019 at 7:54 PM, ZAKRESKY on SUBJECT TELEPHONE #7 (Session 120) placed an outgoing call to Unknown Male (UM), at telephone (304)237-2252.    Based on my training, experience, and the investigation thus far, I believe ZAKRESKY told UM to break into his vehicle located at his residence to find out how much drugs was left in his truck ("I need you to go by my house and break into my truck.", "And see what's left underneath that backseat").    ZAKRESKY stated that PAFFORD was coming over to bring $6,000 and to obtain 2 ounces of heroin ("I got a dude coming to drop $6,000 off", "And pick up uh two more of those, two zips.").

22.    On August 25, 2019 at 11:50 PM, ZAKRESKY on SUBJECT TELEPHONE #7 (Session 143), placed an outgoing call to PAFFORD, on telephone (304) 573-5369. Based on my training, experience, and the investigation thus far, PAFFORD told ZAKRESKY that he was going to ZAKRESKY's residence ("Whenever I leave here I'm going straight to your house."). PAFFORD told ZAKRESKY that he was going to give ZAKRESKY's sister, Jessica, $6,000 from drug proceeds ("Yeah okay, I'm going to give her a six."). PAFFORD asked ZAKRESKY if his friend was waiting on PAFFORD at ZAKRESKY's house ("And uh, your

18

buddy is there waiting on me."). ZAKRESKY replied that his friend would be waiting with two ounces of heroin for PAFFORD ("Yeah with two.").

23. On August 31, 2019, ZAKRESKY on SUBJECT TELEPHONE #7, exchanged text messages with PAFFORD, on telephone (304) 573-5369. The following text messages were exchanged:

PAFFORD (Session 644 at 9:33 AM): yo

PAFFORD (Session 645 at 9:33 AM): i just woke up

PAFFORD (Session 646 at 9:34 AM): can u get me some
                                    more PB

ZAKRESKY (Session 649 at 10:08 AM): Yeah what u want

Based my training, experience and the investigation thus far, PAFFORD asked ZAKRESKY if he could get more heroin ("can u get me some more PB"). ZAKRESKY asked PAFFORD how much heroin did he want ("Yeah what u want"). At 3:41 PM, ZAKRESKY on SUBJECT TELEPHONE #8 (Session 833) received an incoming call from PAFFORD on (304) 573-5369. PAFFORD asked ZAKRESKY to obtain an ounce of heroin ("a whole one") for him and ZAKRESKY told PAFFORD that he would call his supplier. At 3:44 PM, ZARKESKY on SUBJECT TELEPHONE #7 (Session 691) received an incoming call from HOWELL, on telephone (304) 840-1258. ZAKRESKY told HOWELL that he needed him to come see ZAKRESKY because he needed "somethin" and HOWELL told him that he was about to arrive at ZARKESKY's residence. At approximately 3:51 PM, a white Nissan Frontier with license plate

PJY 8740 believed to be driven by HOWEL arrived at ZAKRESKY's residence and then departed at approximately 3:54 PM. At approximately 4:04 PM, ZAKRESKY told PAFFORD that his supplier would be back with the heroin in 20 minutes. At approximately 4:20 PM, HOWELL returned. At approximately 4:24 PM, ZAKRESKY's red Ford Fusion and PAFFORD's dark colored Chevrolet Impala arrived at 173 Lori Street, Beckley, WV. At approximately 4:32 PM, HOWELL departed and at approximately 5:35 PM, PAFFORD's vehicle departed.

24.  On September 1, 2019 at 1:51 PM, ZAKRESKY on SUBJECT TELEPHONE #7 (Session 814) received an incoming call from JARED COOK, on telephone (304) 207-1662. Based on my training, experience and the investigation thus far, COOK told ZAKRESKY that he had money from drug proceeds for ZAKRESKY ("Well not every bit of it but I can definitely stop by and give you probably close to maybe 2 over 2 now…"). ZAKRESKY told COOK to put the money in ZAKRESKY's truck that is located at 173 Lori Street, Beckley, WV ("There just uh stick it in my truck right there out front.").

25.  Based on intercepted calls, it is clear that ZAKRESKY bases his drug trafficking activities at his residence located at 173 Lori Street, Beckley, West Virginia.

<u>CONCLUSION</u>

26.  Based on the above-stated information, probable cause exists that JOHN ZAKRESKY and others are engaged in drug trafficking activities in violations of 21 U.S.C. § 841(a)(1) –

distribution and possession with intent to distribute controlled substances, 21 U.S.C. § 846 - conspiracy to distribute controlled substances, and 21 U.S.C. § 856 - maintaining a drug-involved premises.  Probable cause exists that evidence of those offenses, fruits of those offenses, and property designed for use, intended for use, or used to commit those offenses are currently located at the residence of JOHN ZAKRESKY as more fully described in Attachment A.

Further your affiant sayeth naught.

JOHN HUBBARD
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me, and subscribed ~~in my presence,~~ this 10th Day of September, 2019, pursuant to Rule 4.1 of the FRCrP.

Omar J. Aboulhosn
United States Magistrate Judge

**ATTACHMENT A**

The residence, all structures, vehicles, and curtilage located at 173 Lori Street, Beckley, Raleigh County, West Virginia and within the Southern District of West Virginia.   The residence is a two-story residence with white siding, black roof, and a front covered porch.   The number 173 is marked on the mailbox located at the front of the property.   There is a large covered structure and garage like structure in front of property and a shed and pool located towards the back of the property.







**ATTACHMENT B**

1.   Evidence of Drug Trafficking: Controlled substances, packaging materials, scales, cutting agents, presses, rubber bands, plastic bags, discarded wrappers, ledgers, bills of sale, owe sheets, lists of telephone numbers or other contact information, identifying information of customers and/or suppliers, documents related to the electronic transfer of money to include receipts for Western Union, MoneyGram and the like, prepaid debit cards, items associated with the use of controlled substances such as smoking devices, needles, items with suspected drug residue, cellular telephones, and digital media storage;

2.   Evidence of Occupancy: Utility bills, deeds, mortgage records, identification documents, and mail;

3.   Evidence of Firearms Possession and Use: Firearms, ammunition, bills of sale, firearm boxes and packaging, receipts relative to the purchase firearms and ammunition, photographs of firearms, holsters, slings, ammunition belts, body armor;

4.   Fruits of Criminal Activity: United States currency, all documents showing the purchase, ownership, lease (as lessor or lessee), or sale of any asset, personal or real to include automobiles, boats, motorcycles or similar motorized conveyances to include deeds, titles, and bills of sale.